Our final case this afternoon is case number 417-0693. In re the Marriage of Fowler. And for the appellant we have Miss, Mr. Soff, is that? Yes. I'm sorry, Miss, how do you pronounce your last name? Sayf. Miss Sayf, okay, thank you. And for the appellee, Mr. Wright. Wright. Okay. You may proceed, Miss Sayf. Please support. My name is Adele Sayf and I represent the respondent, Stephanie Fowler. Before I begin, I would offer my apologies to the court in that in preparing for this argument, I noted that on the first page of my brief, I had cited to the incorrect rule as the jurisdictional basis for this appeal. The correct rule is Supreme Court Rule 304-B-6 and for some reason I had cited to 311-A. I had correctly cited to 304-B-6 in my notice of appeal and in the docketing statement, but my brief is incorrect in that regard. Regarding the merits of this appeal, the respondent argues that the trial court erred in finding that she is delusional. The problem is that this erroneous finding of delusional disorder formed the basis for the court's allocation of parenting responsibilities. The court's finding of delusional disorder was based solely on the report of the custody evaluator, Kelly Knutson. Stephanie argues that the court erred by adopting the evaluator's finding of delusional disorder for the following reasons. First of all, the evaluator is a psychologist and there was no evidence offered at trial to the court that the evaluator was qualified to make a psychiatric diagnosis. Secondly, the objective data did not support a finding of delusional disorder here. Counsel, was there any objection to the qualifications and the content of the report at the trial court level? Only to the extent that we presented our own expert to try to refute those findings. Okay, so not as to whether or not the expert was qualified as you're indicating today? That was the gist of the expert's testimony that she, well... I know there were distinct differences in the approach that your expert said that this person should have taken, but I just was wondering if that specific objection was raised at the trial court. Not specifically, but we did question the validity of her findings. Sure. Okay, thank you. Thank you. As I was starting to say, Stephanie's expert, Dr. Luke Dalfion, testified that neither of the principal test instruments used by the evaluator, the MMPI-2 and the MCMI-4, yielded objective data to support the evaluator's conclusion. And Dr. Dalfion's testimony at trial was unrebutted. Another point that Stephanie raises is that the evaluator's logic basically was flawed, in that she reached conclusions based upon a false premise. The evaluator did not believe Stephanie when Stephanie told her that she had grown up in a wealthy family based on the evaluator's observation of Stephanie's hair and her casual attire and the fact that Stephanie was missing some teeth, which actually turned out to be the result of a genetic condition. But based on her appearance at the evaluation, the evaluator concluded that Stephanie was not... that Stephanie... well, this was a basis for her finding of delusion. So the evaluator started with basically a false premise that she could not have had this sort of background given the way she presented herself during the evaluation. There was also no independent corroboration of the evaluator's conclusion. Several of the minor child's teachers testified, and none of them suggested, that Stephanie had ever conducted herself inappropriately. The child's sex abuse counselor testified that Stephanie was always appropriate during the 16 or so months that he had worked with the child and with his mother. And another problem with the evaluation was that there was no objective testing of the child and the evaluator never even spoke to the child's sex abuse counselor, who had actually done objective testing of the child. But those findings were never incorporated into the evaluator's report or findings. So there was no independent evidence to corroborate the evaluator's findings, yet the trial court adopted the recommendations in their entirety and found that Stephanie should have limited supervised contact with the minor child, despite the fact that Stephanie was the child's primary caregiver from the time of his birth until he turned 15. So suddenly, Stephanie went from having what we used to call sole custody to supervised visits, despite the fact that all the teachers, the child's counselor, the people from the TORA study group, and the Boy Scout leader had only positive things to say about the minor child, and nothing negative to say about Stephanie and her conduct. So we... There was at least one teacher, maybe the person was a teacher, maybe they were over special services, special education services, or something like that, that talked about the child having an odor. Yes. Yes. That, well, Stephanie then later testified that the child at that time, and the odor problem was something from, I believe it was fifth grade, when some years previously, the child was, at the time of the hearing, was 15 years old and about to enter high school. So it was old evidence, and Stephanie testified that at the time, that there was a problem with the smell that the child owned. A ferret. A ferret, yes, that he was very fond of. But this was never... The evidence showed that this was never brought to the attention of the authorities. This never rose to anything more than a concern. And I believe that the witness, the teacher, testified that she had never actually spoken to Stephanie about it, which is unfortunate. So Stephanie's position is that the court stripped her of her parental decision-making and ordered supervision of her parenting time based on the evaluator's theoretical construct and not on any known, much less proven, empirical facts. How is it a theoretical construct for the evaluator to be bothered by the uncorroborated assertions of numerous extramarital affairs and fathering out-of-wedlock children and breaking her arm when none of those, I said not corroborated, none of those are shown to be factual in any sense during the hearing? During the hearing, yes. All she had was her testimony. And those were events that occurred... Out-of-wedlock children is kind of... There is objective proof available. Maybe for affairs it's, you know, who knows what happened and what happened when. But the... Accusing your husband and letting your child know that you believe that he fathered out-of-wedlock children and he did that in disregard of the family, that's not very healthy, not very helpful. No, it is not, but it is... I don't know if that really constitutes a delusion. No, I... I don't know if it's delusional or not, but frankly the record doesn't require, doesn't necessarily require in evaluating the other evidence. How about the testimony regarding the telephone issues or the people in the other room are laughing about me or following the evaluator around when she comes to their home and hovering over the child for what purpose, I don't know. Or both in Boy Scouts and the TORUS study, it sounds as if the mother is right there and the only activities this child engages in are ones where he's under the umbrella of the mother. That might be reading too much into the evidence. I mean, the boy does participate in his... in Boy Scouts. He goes on camping trips and that sort of thing. Well, isn't she closely involved with the Boy Scout program? Well, she doesn't go on the trips with them. There was no evidence that she ever goes on any trips with them. Okay. And, you know, the leader testified that one of his goals is to get the kids away from their homes and from their electronic equipment and to form attachments with each other. And I think he testified that that, in fact, had occurred. I am not here to argue that Stephanie is in any way perfect, any more than any of the rest of us are as a parent, but that the finding of delusional disorder did not have a sufficient factual basis. It should be recalled that all of the teachers testified that the minor child is very well-mannered, very sweet, and had no behavioral issues. And, in fact, as I point out, I won't go through it now, but in the brief, the facts of the case favored Stephanie in regard to decision-making for education, health, religion, and extracurricular activities applying the statutory factors. She was the parent who was there while the father was often at sea for six months at a time. So our position is that we're asking this court to reverse the findings. I think that the issues that were raised about Stephanie are somewhat minor in comparison with what was presented in terms of the child, in terms of the product of these 15 years of upbringing. Nobody had anything but positive things to say about the child, and that was because of his upbringing and his rearing. He has done well with his mother, and suddenly to have a finding that really has no basis, and Dr. Delphi went through the testing, the psychological testing, and disagreed strongly with the finding that anything supports, or that either of them, either of the psychological tests supports the finding of delusional disorder. In fact, Dr. Knutson herself testified that she did not testify that the MCMI-IV supported a finding of delusional disorder, and Dr. Delphi had testified that there is an actual finding there under delusion, and there was nothing, no flags were raised with regard to either of the parties. Did your expert either concede or directly testify that some of these elevated scores could result in an individual who feels mistreated, angry, resentful, could harbor grudges, be angry, and that other people might view them as argumentative and irritable? He did so. Well, then absent the diagnoses of delusional disorder, is there enough in this record, assuming that the trial court placed more credence on Dr. Knutson, which the trial court appeared to do, but separate and apart from this more definitive evaluation than perhaps was justified, aren't there a lot of things that would give pause to a trial court that is trying to decide custody? In what sense, Your Honor? A mother who's angry, irritable, people think people are out to get her, who seems overprotective, who tells her child that her father broke her arm and has extramarital affairs and has multiple unwed children, or multiple children of unwed relationships? If you're a trial judge, I think you would sit up and take notice of that. Yes. And then the explanation of the broken arm is that the Navy covered it up? I'm not saying that that's not possible, but when that is said, within the context of some of these other things, where regardless of being diagnosed as delusional, you're looking at a person who's seeing the world through a different prism than perhaps most people. And then you get on, this person suggests that they're a princess of German and Jewish origin and lived on a yacht and you're scratching your head because there doesn't appear to be anything that supports that. There are a lot of people who have grandiose ideas about themselves and say things maybe that aren't true, but if you couple that with those things being showered upon a child or a young man, a trial judge might have pause. I understand, but Your Honor, my client, Stephanie, testified as to what her upbringing was and there was nothing presented in rebuttal of that. Well, the trial court's not required to believe her. No, but... If there are no objective factors other than her testimony that support it. I mean, she comes from good circumstances, but does this and this and this and this, which give me concern if no evaluator had been appointed. Well, I understand the court's concern. The attributes that the court listed in terms of her personality traits, these were direct, these were findings of the psychological testing. These were not findings that were, these were not traits that were testified to in terms of people who have noted aberrant behavior. I mean, typically if you have a person who's got serious psychological issues, there are witnesses coming out of the woodwork who can testify to various events or occurrences, and that simply was not the case here. You mentioned, the court mentioned the telephone. Well, that was simply something that one of the petitioner's relatives mentioned, and it didn't really amount, I didn't think, to anything consequential. We don't have an individual here who's exhibiting psychotic behavior in public. We don't have a person who's attracting the attention of the school officials or the administration by acting out. And certainly there are a lot of people who do that and run into issues in that regard. That wasn't the case here. Counsel, let me ask you this. What role do you think the trial court's consideration of whether or not your client was willing and able to facilitate and support a relationship between the minor and his father, what role do you think that played in the decision? I don't really know. I assume that it might have played a role. But one thing that I think that the courts need to understand is in terms of the overall chronology of events, that Stephanie and the sexual sex abuse counselor genuinely believed that something had happened to this child, that he was touched by his father, that he was exposed to the pornography by his father. And so I think that under those circumstances, it's understandable that a mother would be protective of the child. I'm not saying that it excuses any non-communication or whatever, but I think it's understandable if, in fact, we look at it from the other perspective and say, well, this could very well have been the case. And the sex abuse counselor said that he tended to think that it was the case. It's just that the child was so shy and so unwilling at that point to disclose openly about these matters. I have nothing further unless the court has questions. I don't see any. Thank you. You'll have time on rebuttal if you so desire. Thank you. Mr. Wright? You may proceed. I guess I would like to start out with I think the court here was the ultimate fact finder. I think he took this recommendation and all the facts from the case and made his own opinion rather than relying on the expert. I would point out to the court that the expert was his own witness. It was a court-appointed evaluator. It was not someone that we had requested. And I would point out that Mr. Delphium was a hired expert whose sole purpose was to basically debut Miss Anderson's testimony. But I think based on the facts, and I can go through the facts if the court would like, I think there was a lot of facts that kind of led the court to come to this conclusion. I would point out that the child missed school at least 20 times a year, was consistently failing a couple of classes, was not turning homework in on time. This was an unemployed mother who doesn't work. She is financially supported by her maternal grandmother. She doesn't need money. And I think we would stipulate that Miss Fowler, she was the primary caretaker for the child for a majority of his life, most of his life. Mr. Fowler was in the Navy and he did go on deployments. And afterwards when they separated, the child stayed with Miss Fowler. There was a contempt based on her inability to let him contact the child. And I think a lot of the reason why the court did the decision making the way they did is because these parties cannot co-parent. I think that's an impossibility. But other, I guess, other facts that were in front of the judge, and I would point out this was a seven day trial. This was extensive testimony and it weighed heavily on everyone. But there was the smell of urine in the house. There was smell of urine on the child. When the custody evaluator came to do the homing evaluations, she said the one with the father was carefree, it was nice. The mother was hovering. And she also testified that the child had a bleak room. There was nothing on the walls, no toys. Where at Dad's there was a workbench with Legos and drones, which the father and the son do together. So I think all of that took into account. I don't think the court decision was wrong in this case. And I would point out that a lot of the, all the, there was sexual misconduct allegations, there was allegations of infidelity, domestic violence. All of that was unsubstantiated. The princess from Germany, I guess, it's hard for us to prove that she's a princess from Germany. I think it's harder for us to prove that she isn't almost than to prove that she is. There was testimony that she had presented to the San Diego reporter a receipt asking for any information. None was ever shown to the court. All we had was a receipt from her asking for this information about a princess, Rachel, that was born on that day. So I think, like I said, the custody evaluator, she has been a custody evaluator. She testified 60 times in 10 years. She was court appointed. I would say she was the court's witness. I'm not sure to the court if I have to prove that she's qualified to give the recommendation. She does. I don't think I even have to prove that because she's the court's witness. Was that contested at the trial court level? I don't believe so. Not that I could find in the record. But I think the court did right, and I guess I would ask the court to affirm his decision. Thank you, counsel. Thank you. Anything further, Ms. Safe? I would simply say, Your Honor, that referring to the evaluator as the court's witness is somewhat misleading in that the petitioner had originally requested a psychiatric evaluation of Ms. Fonney, and the court denied that request and appointed a custody evaluator, which is what we agreed to. And there was never any – there was no – nothing presented to either side that this person was qualified to make that psychiatric diagnosis. The diagnosis was never even defined at court. It was simply thrown out there on the basis of some testing that the – and inferences that were made by the evaluator rather than on facts. And at trial as well, there were no facts to support the findings that the evaluator made. Counsel referred to not proving that she's a princess or that she's not a princess. And basically, it was the petitioner's burden to prove that Stephanie is delusional and not our burden to prove that she's not. I mean, how do you prove that you're not delusional? But if, in fact, their premise was that she's delusional, then they had to prove it. And our position is that the evaluation that was done was just simply insufficient to do so. Thank you, Your Honor. Thank you, Counsel. We'll take this matter under advisement and be in recess.